Laramore, Judge,
dissenting:
I respectfully dissent for tlie following reasons:
If either the issue of possibility of reverter or contemplation of death alone was sufficient to require the inclusion of the entire value of the trust corpus in decedent’s gross estate, it is, therefore, the task of this court to decide what issue or issues were the basis of the settlement. If the contemplation of death issue alone, or the contemplation of death and possibility of reverter by operation of law issues together were the basis of the settlement, we should hold against plaintiff. If only the possibility of reverter by operation of law issue was the basis of the settlement we should hold for the plaintiff on the authority of section 7 of the Technical Changes Act of 1949, and plaintiff would be entitled to the entire amount claimed. I believe it is impossible to split the amount of the judgment among the respective issues, that is, to determine that a certain percentage of the stipulated amount was paid because of the possibility of reverter issue and a certain percentage paid because of the contemplation of death issue. If this were done, the concession of the existence of the contemplation of death issue would necessarily bar the plaintiff from any recovery as that issue alone is capable of requiring the inclusion in the gross estate of the entire transfer in question. Once the contemplation of death question is shown to have existed and to have been a basis for the settlement, whether or not the only basis, any taxes paid as a result thereof were correctly levied and cannot be recovered in this action. This is so, notwithstanding the amendment to section 811 (c), because of the issue’s singular capability of including the entire trust corpus in gross estate. The amendment to section 811 (c) provides only for a refund of taxes when paid by virtue of the inclusion in gross estate of property transferred by the decedent in which there exists a possibility of reverter by operation of law to decedent.
As stated above, it is impossible to split a judgment among the various issues when either of the issues alone is sufficient *405 to require the inclusion of the entire value of the transfer in question in the gross estate. To allocate a judgment among the issues in that fashion it would be necessary to say that the judgment represents the total value of the prospective strength of the respective issues on trial; or to put it differently, a total of the proportionate value of the two issues. A tax judgment or settlement, however, does not represent such an evaluation. It is the settlement of a tax deficiency; and its payment represents not a payment of the value of issues on trial but a payment of the tax deficiency which was based on the inclusion in gross estate of certain property which could not have been so included and taxed without statutory authority. The additional tax arises because of the increase in value of the gross estate and not because of a determined value of the respective issues. Imposition of a tax on the later basis would be illegal as the statutes do not authorize it.
BINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Eichard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, Eben W. Pyne, is now the duly appointed and acting executor of the Estate of John M. W. Hicks.
2. John M. W. Hicks, hereinafter sometimes referred to as the “decedent”, died on March 17, 1944, a resident of the County of Wake, State of North Carolina, leaving a last will and testament which was duly admitted to probate in the Superior Court of Wake County, North Carolina. On or about May 10,1944, letters testamentary were duly issued to Lindsay Bradford, the alternate executor named in the will, who duly qualified as such.
3. On Jmie 16, 1945, the executor filed with the collector of internal revenue for the district of North Carolina, at Greensboro, North Carolina, a federal estate tax return for the decedent’s estate showing that there was an estate tax due and payable of $199,065.06 which amount was duly paid to that collector on that date. '
4. Thereafter, the Commissioner of Internal Eevenue, hereinafter sometimes referred to as the “Commissioner”, determined that there was a deficiency of $1,073,378.58 in *406 the estate tax due from that estate. That deficiency resulted largely from the inclusion in the decedent’s gross estate of various transfers made by him during his lifetime which were determined to have an aggregate value at the date of the decedent’s death of $2,453,971.86.
5. The following transfers were determined by the Commissioner to be includible in the decedent’s gross estate as transfers made in contemplation of death:
A. Trusts established with City Bank Farmers Trust Company (formerly known as The Farmers’ Loan and Trust Company) as trustees, as follows:

B. Outright transfers to certain of the decedent’s close relatives, most of which transfers were of 100 shares of IT. S. Tobacco Co. common stock and 100 shares of R. J. Reynolds Tobacco Co. B stock transferred in September 1939 and March 1940, which transfers had a value at the date of the decedent’s death of $2,400 and $3,000 respectively. The aggregate value of all of such transfers at the date of the decedent’s death was $199,567.50.
6. The following transfers were determined by the Commissioner to be includible in the decedent’s gross estate as transfers made in contemplation of death, or as transfers intended to take effect in possession or enjoyment at or after his death, or both:
A. Trust created by decedent with City Bank Farmers Trust Company (formerly known as The Farmers’ Loan and Trust Company) under agreement dated August 2, 1926, which had a value at the date of the decedent’s death of $522,390.19, hereinafter referred to as the 1926 trust.
*407 B. Trust created by decedent with City Bank Farmers Trust Company under agreement dated March 1, 1935 for the benefit of John Hicks Johnson et al., which had a value at the date of the decedent’s death of $154,> 100, hereinafter referred to as the 1935 trust for John Hicks Johnson.
C. Trust created by decedent with City Bank Farmers Trust Company under agreement dated March 1, 1935 for the benefit of Mary Norris Cooper et al., which had a value at the date of the decedent’s death of $21,-137.50, hereinafter referred to as the trust for Mary Norris Cooper.
D. Trust created by decedent with City Bank Farmers Trust Company under agreement dated December 12, 1941, which had a value at the date of the decedent’s death of $601,115.80, hereinafter referred to as the 1941 trust.
7. Under the agreement creating the 1926 trust the decedent reserved the income of the trust to himself for his life. Upon his death the trustee was to pay out of the principal of the trust any and all transfer, inheritance, succession and estate taxes which might be imposed by reason of the decedent’s death. The principal remaining after the payment of any such death taxes was to be divided into so many equal shares that there would be one share for each of the grant- or’s nieces who was living at the time of his death and two shares for the benefit of Bertha Norwood Hicks, the widow of the grantor’s brother, provided she survived the grantor. Such shares were to be held in separate trusts to pay the-income to the person for whose benefit the share was so set apart during her life. In the event any niece predeceased the grantor leaving issue who were alive at the time of his death the share which otherwise would have been set apart for her benefit was to be divided among the issue of all of the grantor’s nieces and nephews living at the time of his death free of any trust. Further provision was made that upon the termination of any separate trust the principal thereof was to be divided among the children of the nephews and nieces of the grantor living at the date of the termination of such separate trusts, the then living issue of any predeceased child of any of the nephews or nieces of the grantor-to take the share which his or her parent would have taken per stirpes. In the event none of such persons were' *408 living, the principal dtf each, such trust was to be divided among the then living descendants of the grantor’s father and mother, in equal shares per capita. No further alternative disposition of the principal of the 1926 trust was made. The trust was irrevocable and the decedent reserved no powers to change the beneficial interests therein.
8. Under the agreement creating the 1985 trust for John Hicks Johnson, the income of the trust during the grantor’s life was to be paid to John Hicks Johnson, his nephew, and to Mary Johnson Hart and Margaret Louise Johnson, his nieces, in equal shares, and in the event any of them predeceased the grantor leaving surviving issue, the income otherwise payable to such person was to be paid to the surviving issue during the grantor’s life. Upon the death of the grantor, the principal of the trust was to be distributed to his sisters, Elizabeth Hicks Johnson and Bertha Hicks Turner, his sister-in-law, Bertha Norwood Hicks, and his nephew, Frank Page Hicks, if they survived the grantor. If any of such persons predeceased the grantor, their portion of the principal was to be distributed in equal shares to the children of the grantor’s nephews and nieces who survived him and to the surviving issue per stirpes of any child of a nephew or niece of the grantor who should have predeceased him. In the event none of such persons survived the grantor, the principal was to be distributed to the surviving descendants of his father and mother. No further alternative disposition of the principal of the trust was made. The trust was irrevocable and the decedent reserved no powers to change the beneficial interests therein.
9. Under the agreement creating the 1935 trust for Mary Norris Cooper, the income of the trust was to be paid to her during her life. Upon her death the principal was to be distributed to the then living children of the grantor’s nephews and nieces and to the then living issue per stirpes of any nephews or nieces of the decedent who predeceased Mary Norris Cooper. In the event none of the persons designated survived Mary Norris Cooper, the principal was to be distributed to the surviving descendants of the grantor’s father and mother. No further alternative disposition of the principal of the trust was provided for, and *409 the decedent reserved no power to change the beneficial interests therein. The trust was irrevocable.
10. Under paragraph Sixth of a will executed under date of December 8, 1926, the decedent made specific bequests of certain shares of stock to his sisters, Elizabeth Hicks Johnson and Bertha Hicks Turner, his sister-in-law, Bertha Norwood Hicks, and his nephew, Frank Page Hicks. The bequests to Elizabeth Hicks Johnson and Frank Page Hicks were identical with the provision made for their benefit in the 1935 trust for John Hicks Johnson while the bequests to Bertha Hicks Turner and Bertha Norwood Hicks varied somewhat from the provision made for their benefit in such trust.
11. On the same day the decedent executed the 1935 trust for John Hicks Johnson and the 1935 trust for Mary Norris Cooper, he executed a codicil to bis last will and testament which recited that he had made other provision for the persons named in paragraph Sixth of his will as set out in the preceding finding and revoked such provisions of his will.
12. Under the agreement creating the 1941 trust, the income was to be paid in equal shares to thirty-one named children of the decedent’s nephews and nieces until December 31, 1966, or the prior death of the survivor of such thirty-one children, except that if any such child died leaving surviving issue, such issue was to take the share which otherwise would have been paid to his or her parent. On December 31, 1966, or the prior death of the survivor of the thirty-one named children of the nephews and nieces, the principal of the trust was to be paid over in equal shares to such of the thirty-one named children as are then living. If any of such children as are then dead left issue who are then living, such issue are to take in equal shares per stirpes the share their parent would have taken if living. If no such persons are alive to take, the principal is to be paid over to the persons to whom and in those proportions in which it would have been distributable if the decedent had then died possessed thereof in his own right, intestate and a resident of North Carolina. This trust was irrevocable, and the decedent reserved no power to change the beneficial interests therein.
*410 13. On or about June 12, 1946, the executor filed with the internal revenue agent in charge at Greensboro, North Carolina, a written protest against the Commissioner’s determination that there was a deficiency in the federal estate tax due from the estate.
14. Such protest urged that none of the transfers, which the Commissioner had determined were includible in the gross estate as transfers in contemplation of death, were properly so includible. The first ground advanced in support of that position was that at the time the decedent made all of such transfers he was in good health and was an active and vigorous man so that such transfers were not made in contemplation of his death insofar as the condition of his health was concerned. The second ground advanced in support of that position was that the decedent had a close and affectionate relationship with his relatives, helped them out of financial difficulties, preferred that they enjoy his money while he was living rather than sit around and wait for him to die, and made all of such transfers over a twenty-three year period pursuant to a settled practice of giving his relatives substantial portions of 'his fortune, such transfers being made as a part of his philosophy of life rather than in contemplation of death.
15. Such protest analyzed in detail the provisions of the trust agreements governing the four transfers determined by the Commissioner to have been transfers to take effect in possession or enjoyment at or after the decedent’s death, in the light of the regulations as amended by TD 5512 on May 1,1946.
16. Such protest pointed out that the remaindermen of the 1941 trust did not have to survive the decedent to take so that the trust failed to satisfy one of the two tests of the regulations for includibility in the gross estate as a transfer to take effect in possession or enjoyment at or after death.
17. Such protest conceded that the remaindermen of the 1926 trust had to survive the decedent to take, but urged that the double test of the regulations was not satisfied because neither the decedent nor his estate had any right or interest in the property within the meaning of the reg *411 ulations because of the remoteness of the possibility of reverter.
18. Such protest recited the provisions of the trust instrument governing the 1935 trust for John Hicks Johnson, which showed that the remaindermen had to survive the decedent to take, but urged that the double test of the regulations was not satisfied because neither the decedent nor his estate had any right or interest in the property because of the remoteness of the possibility of reverter.
19. Such protest pointed out that under the provisions of the trust instrument governing the trust for Mary Norris Cooper, there was no requirement that the beneficiaries survive the decedent to take so that the trust did not meet the test of the regulations for includibility in the gross estate.
20. In addition to the protest, John Hicks Johnson gave sworn testimony to the examining revenue agent to the effect that the decedent was an active and vigorous man who was in excellent health until about a year before his death; that the decedent’s relations with his family were cordial; that whenever members of the family got into financial difficulties they came to decedent to 'borrow money; that decedent expected to look out for the family financially and preferred that his relatives have some money while he was living so that they would not sit around waiting for him to die; that decedent never discussed estate taxes with him in connection with the creation of any of the trusts, although the decedent did discuss with him income taxes and the North Carolina intangible property tax; that the 1935 trust for John Hicks Johnson had been created so that he would not have to borrow money from the decedent and because the decedent thought the income beneficiaries thereof needed money; and that the trust for Mary Norris Cooper had been established because she had a young son and her husband was ill with tuberculosis. The executor also gave the examining revenue agent an affidavit of the decedent’s physician in support of the contention that decedent was in excellent health, an affidavit of the professional at the golf club at which the decedent played to the effect that decedent played golf regularly through November 1942, an *412 affidavit that decedent told Ms nephew, Will Wyatt, that he had created the 1921 trust for him because his family was growing up and he needed the money, and affidavits of decedent’s niece and niece-in-law to the effect that the decedent repeatedly stated he wanted his family to enjoy his money while he was alive so that they would not wish he would die.
21. Thereafter Mr. Bollin Browne, counsel for the executor, had a conference at Greensboro, North Carolina, with Mr. Edward DeMik, a conferee in the office of the internal revenue agent in charge at Greensboro on July 12,1946, concerning the estate tax liability of the estate. At such conference, in addition to the considerations and evidence referred to in the preceding findings as having been submitted to the revenue agent, further evidence on the contemplation of death issue in the form of letters written by the decedent was exhibited by counsel for the estate to Mr. DeMik. Such letters related to the financial needs of the decedent’s relatives and indicated the decedent’s disapproval of making loans to relatives or receiving constant requests for financial assistance. At the close of the conference, Mr. DeMik suggested that Mr. Browne submit an offer in settlement of the case, and Mr. Browne agreed to consider the matter and get in touch with Mr. DeMik later.
22. After Mr. Browne returned to New York he talked to Mr. DeMik on the telephone and offered to settle the case by including in the decedent’s gross estate the 1926 trust and the 1935 trust for John Hicks Johnson and $100,000 of the 1941 trust; all other transfers to be excluded from the gross estate. In addition, certain other adjustments which are not here material were to be made. Mr. DeMik made a counteroffer to settle on the basis of including in the gross estate the 1926 trust, the 1935 trust for the benefit of Jolm Hicks Johnson, and one-half (approximately $300,000) of the 1941 trust. Mr..Browne did not accept that counteroffer but thereafter telephoned Mr. DeMik again and offered to split the difference on the 1941 trust by agreeing to the inclusion of one-third ($200,371.93) thereof in the gross estate. Mr. DeMik agreed to recommend such a settlement. The basis on which Mr. Browne was willing to concede the *413 1926 and 1935 trusts were includible in the decedent’s gross estate was that he was of the opinion they were transfers intended to take effect in possession or enjoyment at or after the decedent’s death and not transfers made in contemplation of death, and that the part of the 1941 trust to be included was includible as a transfer made in contemplation of death and not as transfers intended to take effect in possession or enjoyment at or after the decedent’s death.
23. On July 31, 1946, Mr. Browne called Mr. Joseph B. Cheshire, Jr., of North Carolina, counsel for the estate, and advised him of his negotiations with Mr. DeMik and that he had finally agreed to recommend to the executor a settlement under which the 1926 trust and the 1935 trust for the benefit of John Hicks Johnson were to be included in the gross estate as transfers to take effect in possession or enjoyment at or after death and one-third of the 1941 trust was to be included in the gross estate as a transfer made in contemplation of death. He stated that Mr. DeMik had agreed to the inclusion of the 1926 trust in full, the 1935 trust in full, and approximately $200,000 under the 1941 trust. Mr. Browne further stated that the executor wished to have the beneficiaries approve the proposed settlement before agreeing to it and asked Mr. Cheshire to take it up with the beneficiaries in Baleigh, North Carolina.
24. On July 31, 1946, Mr. Browne wrote a letter to Mr. Bradford, as executor of the decedent’s estate, describing the proposed settlement as requiring the inclusion in the gross estate of the 1926 trust and the 1935 trust for the benefit of John Hicks Johnson as transfers intended to take effect in possession or enjoyment at or after the decedent’s death and one-third of the value of the 1941 trust as having been made in contemplation of death. In discussing the settlement, Mr. Browne stated in his letter :
In my opinion, the proposed settlement is a fair one and should be accepted by you as executor. The 1926 and 1935 transfers of $522,390.19 and $154,100, respectively, are in my opinion properly taxable as transfers intended to take effect in possession or enjoyment at or after the decedent’s death. In the case of the 1926 transfer, the decedent reserved the income to himself for life, and in the case of the 1935 transfer, the term of the *414 trust was measured by the decedent’s life. In both cases, the transfer of the remainder interest in the property after the decedent’s death was conditioned on the transferees surviving the decedent, and if none of such transferees had survived the decedent the property would have reverted to his estate. Accordingly, in my opinion, both of said transfers were transfers “conditioned on survivorship” which, -under the Treasury regulations, are taxable as transfers intended to take effect in possession or enjoyment at or after death.
As to the 1941 transfer, I do not think that it or any part of it was made in contemplation of death. However, it was made less than three years before the decedent’s death and at a time when the decedent was eighty-two years of age. Although the decedent was then apparently in excellent health for a man of his age, the transfer nevertheless included a very substantial portion of his wealth and it was made for the benefit of persons who were the natural objects of his bounty. Moreover, the decedent undoubtedly had thoughts of death in his mind when he made the 1926 and the 1935 transfers; as stated, both of those trusts were measured by the decedent’s life. In the case of the 1926 trust, of which he reserved the income for his own life, he obviously thought that such trust would be subject to estate tax because he provided in the trust instrument for the payment of the tax out of the trust estate; in the case of the 1935 transfer, the decedent at the same time changed his will so as to revoke bequests of the same property to the same beneficiaries. It is, therefore, quite possible that both of these transfers are taxable as transfers in contemplation of death, as well as transfers intended to take effect in possession or enjoyment at or after death and, if so, that fact would make it difficult for us to prove that the 1941 trust, and perhaps the 1939 and 1940 transfers, were not also made in contemplation of death.
Accordingly, taking a broad view of the entire case, I think the inclusion in the estate of the 1926 trust of $522,390.19, the 1935 trust of $154,100.00, and one-third of the 1941 trust of $601,115.80 ($200,371.93) would be a fair and satisfactory settlement, and I advise that you authorize me to notify the conferee that such a settlement will be acceptable to you.
25. As shown in finding 22, Mr. Browne was willing to include in the decedent’s gross estate the 1926 trust and the 1935 trust for the benefit of John Hicks Johnson as transfers *415 to take effect in possession or enjoyment at or after tbe decedent’s death because he considered those trusts taxable on that ground. Mr. Browne also was willing to include those trusts on that basis rather than as transfers in contemplation of death for two additional reasons. The first was he was convinced by the evidence that none of the decedent’s transfers had been made in contemplation of death. Secondly, since there were numerous transfers beginning in 1921 and ending in 1941 which the Commissioner had determined to be in contemplation of death, Mr. Browne was determined not to concede that any transfer made prior to the 1941 trust was in contemplation of death because he felt such a concession as to an earlier transfer would make it difficult to sustain his position that subsequent transfers had not been made in contemplation of death. Mr. Browne also felt that if he conceded any of the earlier transfers had been made in contemplation of death, without making a similar concession as to subsequent transfers, the Treasury Department would not approve the settlement.
26. Despite Mr. Browne’s opinion that none of the transfers were made in contemplation of death, he was aware of the possibility that an adverse determination by the Commissioner might be sustained by a court because the executor might not carry the burden of proof that all of the numerous transfers were not made in contemplation of death. At no time prior to the settlement did either party concede any of the issues in the case. The offer of settlement was made for the purpose of disposing of and did dispose of the entire case.
27. Upon receipt of Mr. Browne’s letter recommending the settlement, the executor of the decedent’s estate forwarded copies of it to the persons interested' in the decedent’s estate and requested their approval. Such persons agreed to the settlement as outlined in Mr. Browne’s letter and the executor authorized Mr. Browne to enter into the settlement.
28. Under date of August 8, 1946, Mr. Browne wrote to Mr. DeMik advising that the executor was willing to settle on the basis of including in the gross estate “all of the 1926 trust, all of the 1935 trust for the benefit of John Hicks Johnson et als., and one-third of the 1941 trust * * and making certain other adjustments not material here.
*416 29. Under date of September 18,1946, the internal revenue agent in charge at Greensboro, North Carolina, forwarded to the Commissioner a conference memorandum report made by Mr. DeMik recommending the settlement together with the file in the case and stating that his office concurred in Mr. DeMik’s recommendation. It was stated that an authorized attorney for the estate had requested that the proposal be submitted to the Bureau for consideration and action before evidence was submitted relative to certain additional administrative expenses.
30. The conference report of Mr. DeMik recommended that the proposed settlement be accepted. The various transfers and gifts involved were discussed therein. With respect to certain of the trusts and outright transfers which had been included solely on the ground that they had been made in contemplation of death, the memorandum recommended that they should be eliminated from the gross estate. This did not include the 1926 trust, either of the 1935 trusts or the 1941 trust. With respect to the 1926 trust (referred to as item 13) and the 1935 trust for the benefit of John Hicks Johnson (referred to as item 15) the following comment was made:
Since the taxpayer has agreed to the full inclusion of items 13 and 15 no further comments with respect to these items are being made herein.
However, item 15 was discussed further in connection with the discussion of item 14, the trust for the .benefit of Mary Norris Cooper. It was recommended that this trust (item 14) not be included since it was set up for a motive associated with life, such motive being to give financial aid to the family of a grandniece. The report went on to state:
This item is materially different from Item 15 which is recommended for inclusion in the gross estate. The gift covered by Item 15 was made on the same date as the gift covered by Item 14. However, Item 15 consists of certain property which the decedent had willed to named individuals. While during decedent’s lifetime, the income from this property did not go to these individuals named in his will, such individuals did acquire the property at his death. On the same date that the trust for Item 15 was drawn up decedent executed a codicil to his will eliminating the assets of Item 15 *417 therefrom as well as the interest of the named beneficiaries. The gift covered by Item 15 is therefore testamentary in character and should be included in the gross estate.
With respect to item 16, the 1941 trust, the report stated:
Taxpayer is willing to agree to the inclusion of % of Item 16. This gift was made in trust more than two years and three months prior to decedent’s death. It was also made about a year and three months prior to any fatal physical infirmities. The beneficiaries of the trust totalled 31. The gift was valued at $601,115.80. At the date of his death, the decedent had remaining a gross estate of $849,128.16 as shown by the return, and also had a life interest in a trust set up in 1926 which is included in the gross estate at a value of $522,390.19. Therefore, without invasion of the corpus of his estate decedent had available the income from property worth nearly $1,400,000.00 which was more than ample to take care of his modest living needs and to carry out his lifetime policy of remembering his relatives on birthdays, anniversary dates, etc.
The report then discussed the case of the Estate of Charles Delaney, a circuit court decision dealing with the contemplation of death issue, and concluded as follows:
Taxpayer is not willing to agree to inclusion of the balance of the gifts which were made during 1939 and 1940 except for a gift of $3,000.00 during 1937. These gifts are shown in the revenue agent’s report as Item 17-56, inclusive. None of the gifts exceed $3,000.00 in value which is $1,000.00 less than the gift tax exclusion allowable at that time. If the primary motive for. these gifts had been to avoid tax it would seem logical that the gifts would have been made in the approximate amounts of the gift tax exclusion.
In view of decedent’s long established policy of helping out and making gifts to his relatives, it appears that the Government could not win this issue. It is concluded that this case involves debatable issues, the successful defense of which is by no means certain and that the taxpayer’s proposal for settlement would be to the best interest of the Government..
In connection with the consideration of this case it has been thoroughly considered in its entirety, including all changes, and the recommendation that taxpayer’s proposal be accepted comprehends all possible adjustments beneficial to the Government.
*418 3L The question, of whether the settlement should be approved was assigned to Mr. Paul F. Schmid, at that time the principal estate tax examiner in the Commissioner’s office. After consideration of the matter Mr. Schmid came to the conclusion that the offer should be accepted. With respect to the 1926 trust he felt that it was includible under the regulations then in force, T. D. 5512, as a transfer to take effect in possession or enjoyment at or after death. However, he realized there was some conflict in the decided court cases and that some of them had held that where the possibility of reverter was very remote the transfer was not includible on the ground that the decedent had a revei’sion-ary interest. On the question of whether the transfer was made in contemplation of death, he felt there was substantial ground for so holding since the decedent had reserved the income for life and had accordingly provided that death taxes should be paid out of the corpus.
As to the 1935 trust, the one for the benefit of John Hicks Johnson, although the decedent did not reserve the income for life he did enjoy a remote possibility of reverter. However, as in the case of the 1926 trust, Mr. Schmid realized there was some doubt whether it would be held that it was a transfer to take effect in possession or enjoyment at or after death. He felt that the contemplation of death issue was strong in the Government’s favor in the case of the 1935 trust for the reason that it was made at the same time the decedent executed the codicil to his will which referred to the trust as making provision for the persons whose rights in the estate were eliminated or decreased by the codicil.
32. Mr. Schmid prepared a letter for the Commissioner’s signature addressed to the internal revenue agent in charge at Greensboro approving the settlement. This letter was dated October 15, 1946, and refers to the various trusts and the provisions thereof. With respect to the 1941 trust, it concludes that there was no possible reversion to decedent or his estate. The letter then goes on to state:
In Trust G-13, of August 2, 1926, for the benefit of decedent and others, the decedent was to receive the income for his life. There are various provisions as to disposition of the property at decedent’s death, but it *419 will be noted that there is no direction for disposition in the contingency of the decease of a number of persons without surviving issue, and it would follow, by operation of law, that in such contingency there would be a reversion to decedent’s estate.
Under the terms of Trust G-15, of March 1,1935, for the benefit of John Hicks Johnson and others, the income was payable to various persons during decedent’s life. At decedent’s death the trust is to terminate and distribution made to various persons if surviving, and/ or the then living children of various persons. There is no provision for the contingency of the decease of all of such persons and such children and it would follow by operation of law that there would be a reversion to the decedent’s estate.
The arguments made by the estate in the Protest, as to trusts G-13' and G-15, are appreciated. However, they both meet the requirements of Treasury Decision 5512 for taxability and, despite the factor of remoteness, are includible in the gross estate. It is noted that the estate for settlement purposes concedes includibility of these trusts.
The ground for the inclusion of the transfers on the basis that they were made in contemplation of death appears strongest, as the report indicates, in the case of the creation of trusts G-14 and G-15 in view of the circumstances under which they were made and as to trust G-13 for the reason that its terms provided for payment of death taxes, if any, out of principal. It is conceivable that inclusion of all of the transfers might be sustained on the basis that they were each made as part of a common plan of distribution in lieu of a testamentary disposal, in view of the total amount of the gifts and the decedent’s age. On the other hand, from the facts made available, the living motives appear strong, and there is an absence of a poor health record despite the decedent’s advanced age.
In consideration of the debatable issues in the case and all other factors, it is believed that acceptance of the offer of settlement is justifiable. The file enclosed with your letter is returned herewith.
33. The decedent died suddenly of a heart attack on March 17, 1944, at the age of 85. Prior to his death he had had no serious illness or injuries except an automobile accident in 1937, from which he recovered completely in a short time, and a heart attack in July 1943. The decedent was very active and continued to play nine holes of golf regularly *420 through all of 1942 and played some golf in the spring of 1943. The decedent learned to use a typewriter around the beginning of 1940 when he was 81 years of age. The decedent’s father and mother lived to advanced ages. Iiis mental condition was very good until at least approximately one or two years prior to his death.
34. The decedent’s relationship with his family was close and affectionate. He kept a record of their birthdays which he checked off as he gave them gifts, and always remembered them with Christmas gifts.
35. Whenever any of the family got into financial difficulties they came to the decedent for help. The decedent said he expected to look out for his family financially. Although members of the family often sought to borrow money from the decedent when they were in financial difficulties, the decedent did not like to lend money to his relatives because, in his opinion, money lenders were not esteemed. Instead, the decedent preferred to take care of his relatives’ needs by making gifts which would produce income.
36. Upon the occasion of creating trusts for, or making gifts to, some of his nephews, the decedent said his motive was to help his folks while he was living so that they would not sit around waiting for him to die or wishing he would do so.
37. When the decedent created a trust for his brother, Will, in 1921, he did it to enable this brother to educate his children and to take care of himself and his family comfortably.
38. In 1921, the decedent created a trust for his nephew, Frank Page Hicks, at the time he lost his job, in order to give him some income and to encourage thrift.
39. In 1921, the decedent created a trust for his nephew, Marion Wyatt, at the time of his marriage, in order to enable Marion to pay off his note to the decedent.
40. In addition to the trusts created by the decedent for the benefit of his sister, Elizabeth Hicks Johnson, the decedent during the period May 1916 to February 1921 made outright gifts of stock to that sister which had cost him approximately $22,800.
*421 41. In addition to the trusts created by the decedent for the benefit of his brother, William Bowes Hicks, the decedent during the period April 1919 to February 1921 made outright gifts of Stock to this brother which had cost him approximately $20,000. In 1932, the decedent gave this brother’s widow, Bertha Norwood Hicks, shares of R. J. Reynolds Tobacco Co. B stock which cost him approximately $3,350.
42. In addition to the trusts created by the decedent for the benefit of his sister, Bertha Hicks Turner, the decedent during the period March 1921 to November 1930 made outright gifts of stock to this sister which had cost him approximately $30,000, and also gave her $10,000 in cash on account of her house.
43. In addition to the trust created for the benefit of William L. Wyatt and the transfers of stock made to him in 1939 and 1940, the decedent gave him $10,800 in cash during the period from 1931 to 1937 and also gave him shares of stock in the Job P. Wyatt & Sons Co. which had cost the decedent $35,000 and 1,000 shares of common B stock of R. J. Reynolds Tobacco Co.
44. In addition to the trust created for the benefit of Robert J. Wyatt and the transfers of stock made to him in 1939 and 1940, the decedent gave him $11,800 in cash during the period from 1931 to 1937 and also gave him shares of stock in the Job P. Wyatt & Sons Co. which had cost the decedent $34,000 and 1,000 shares of common B stock of R. J. Reynolds Tobacco Co.
45. In addition to the trust created for the benefit of Marion F. Wyatt and the transfers of stock made to him in 1939 and 1940, the decedent gave him $9,300 of cash in 1935 and 1937 and also gave him in 1929 shares of $6 preferred stock of Carolina Power & Light Co., gave him in 1932, 1,000 shares of common B stock of R. J. Reynolds Tobacco Co., and gave him shares of stock of Job P. Wyatt & Sons Co., which had respectively cost the decedent $10,204, $3,349.70, and $40,000.
46. Shortly after the creation of the 1935 trust for John Hicks Johnson and his two sisters, the decedent told the husband of one of the sisters that this nephew and these two *422 nieces were bis only nephew and nieces who were not receiving some income from funds which he had set up and that he had set up this trust in order that these relatives might have some money of their own.
47. The 1941 trust named as beneficiaries only such grandnephews and grandnieces of the decedent as were living at the date the trust was created. Other grandnephews and grandnieces were born after the trust was established.
48. After deducting a net long term capital loss of $8,049.83, the decedent’s taxable net income for federal income tax purposes for 1941, as reported in his income tax return for that year, was $69,272.72 on which his income tax was $35,489.43.
49. Prior to establishing the 1941 trust, the decedent estimated that the property he intended to put into the trust, after deducting expenses, should produce an income of approximately $1,000 a year for each of the thirty-one beneficiaries. The property transferred to the 1941 trust produced gross dividends in 1941 of $33,142.50. The decedent later checked as to the amount the trust had produced for each beneficiary in 1942 and found it had produced only about $750 for each beneficiary.
50. On November 18, 1941, which was shortly before the 1941 trust was established, the decedent wrote to City Bank Farmers Trust Company, which was trustee of the other trusts established by the decedent and said that in view of the fact that income and other taxes would be greatly increased next year, he was considering establishing another trust to offset to some extent the increased taxes. The decedent’s gift tax return for 1941 in reporting the creation of the 1941 trust stated that the motive for the gift was:
To reduce recurring annual taxes, both Federal and State, and to furnish income to relatives to aid in defraying the cost of their education and in meeting other expenses.
On <January 26, 1942, the decedent advised the president of the American Telephone and Telegraph Company that he had not sold such stock but had put it in trust for the benefit of young relatives and that he hoped the dividends would aid the children in their schooling.
*423 51. The decedent did not discuss estate taxes with his legal adviser at the time he established the 1941 trust, although he did discuss with him income taxes and the North Carolina intangible property tax.
52. Based upon the settlement referred to in findings 22 to 32, inclusive, the Commissioner determined that the decedent’s gross estate was $1,728,756.92, that the allowable deductions (other than the specific exemptions) were $101,657.76, and that the net estate for the purposes of the estate tax imposed by section 810 of the Internal Revenue Code was $1,527,099.16 and for the purposes of the additional tax imposed by section 935 of the Internal Revenue Code was $1,567,099.16. After allowing credit for state estate and inheritance taxes of $72,751.14 and federal gift taxes of $2,-859.15, the net tax imposed by section 810 was determined to be $15,328.63. After allowing credit for federal gift taxes of $28,137.60, the net additional tax imposed by section 935 of the Internal Revenue Code was determined to be $439,318.10.
53. Thereafter the executor filed, pursuant to the provisions of section 871 (d) of the Internal Revenue Code a waiver of restrictions upon the assessment and collection of a deficiency of $255,581.67 in federal estate tax.
54. The settlement, heretofore referred to, which formed the basis of the Commissioner’s determination, was not made pursuant to a closing agreement or a compromise within the meaning of sections 3760 and 3761, respectively, of the Internal Revenue Code.
55. On December 14, 1946, the executor pursuant to such settlement, duly paid to the collector of internal revenue for the district of North Carolina, such deficiency of $255,581.67, together with interest thereon of $23,002.34, that is, a total of $278,584.01.
56. On October 20, 1950, the executor duly filed with the Commissioner a claim for the refund of $227,266.74 of estate tax overpaid and of $17,905.65 of interest overpaid upon the deficiency determined to be due by the Commissioner.
57. Such claim demanded refund on the ground that the 1926 and 1935 trusts had been included in the gross estate as transfers to take effect in possession or enjoyment at or *424 after the decedent’s death within the meaning of section 811 (c) of the Internal Revenue Code in force at the date of his death and not as transfers in contemplation of death; that such trusts are not includible in the gross estate under section 811 (c) (1) (B) or (C) as amended by section 7 of Public Law No. 378; and that such trusts were not includible in the gross estate under any other provision of section 811 of the Internal Revenue Code.
58. On April 4, 1951, the Commissioner denied and rejected the claim for refund filed on October 20, 1950, as aforesaid, and notified the executor to that effect by notice sent by registered mail on that date. No part of the sum so claimed in such refund claim has been credited, refunded or repaid to the executor or to anyone for his account.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on March 13,1959, that judgment for the plaintiff be entered for $173,404.90.